## MORITZ GRELLE vs. EDGAR W. PINNEY AND ANOTHER.

New Haven & Fairfield Cos., Jan. T., 1893. ANDREWS, C. J., CARPENTER, TORRANCE, FENN and PRENTICE, Js.

The territory of a town included the smaller territory of a city, the town being divided into four voting districts coincident within the city limits with the four wards of the city, but embracing town territory beyond them. The town and city arranged to hold their annual election at the same time and places. All the city voters were town voters but a part of the town voters were not city voters. Two boxes were therefore provided in each ward, one marked "town box" and the other "town and city box," city voters dropping their ballots for both town

and city officers into the latter box and the voters residing outside the city limits dropping their votes for town officers into the former. All votes cast by any one voter were in a single envelope as required by law. When the polls were closed the boxes were emptied upon two separate tables, and the town counters counted the ballots from the "town box" and the city counters counted the city ballots and passed over to the town counters the ballots for town officers that came from the "town and city box." *P* was a candidate for one of the town offices. The counters used a machine, designed to facilitate the opening of the envelopes, which *P* as selectman the previous year had purchased for the town and the operation of which he understood, and the city counters requested him to show them how to use it. He then cut open a few of the ballots from the "town and city box," to show its operation, but did nothing more. Held that he did not "take part in the count" in such a manner as to make void the votes cast for him as a candidate under the provisions of Gen. Statutes, § 229.

*B* was at the same election a candidate for a town office. After the ballots contained in the "town and city box" had been deposited upon the table, he as a city counter counted the whole number of envelopes in the box and selected for rejection such as were unsealed. At least ten were so rejected. He then proceeded to open the envelopes and count the city ballots, the town counters counting the town ballots that came from the box. He never came in contact with the town box or the ballots placed in it. Held that *B* "took part in the count" of the town vote within the meaning of the statute.

His acts were appropriate to the act of counting, and as essential to the process of arriving at a determination of the contents of the box as the subsequent handling of the ballots for the more immediate purpose of enumeration. The statute must be construed as embracing all those acts of the counter which are within the natural and proper scope of his duties, and which bring to him an opportunity to perpetrate a fraud.

But held that the effect of *B's* conduct was not to invalidate all votes cast for him, but only the mass of ballots which he thus had an opportunity to reach and disturb. As he had had nothing to do with the "town box" or the envelopes that came from it, the votes for him from that box were not affected.

Gen. Statutes, § 58, provides for a review of any contested city or town election upon a petition to a judge of the Superior Court, and § 1137 for an appeal from the judgment in such a case to the Supreme Court of Errors. Held that an appeal in such a case carries with it a stay of execution.

(The court did not pass upon the question of the legality of the proceeding adopted by the town and city for taking the votes of both classes of voters together, as the counsel on both sides waived all objection to the proceeding.)

[Argued January 17th—decided February 4th, 1893.]

PETITION to *Thayer, J.*, under Gen. Statutes, § 58, which

authorizes a judge of the Superior Court, on petition, to hear and decide upon contested claims to city and town offices. The offices in question were those of selectmen of the town of Waterbury. The judge made a finding of facts and held upon the facts that Edgar W. Pinney, one of the respondents, was elected a selectman, and that George A. Boughton, the other respondent, was not elected. The plaintiff and Boughton severally appealed from the judgment. The case is fully stated in the opinion.

*J. O'Neill*, for the plaintiff.

*S. W. Kellogg* and *G. E. Terry*, with whom was *J. P. Kellogg*, for the respondents.

PRENTICE, J. The territorial limits of the city of Waterbury are not co-extensive with those of the town of Waterbury. The city is divided into four wards; the town into four voting districts. Each town voting district contains all the territory of a similarly numbered city ward, and other territory lying without the city limits. On the first Monday of October, 1892, pursuant to statute, there was held the annual town meeting for the choice of town officers. On the same day, pursuant to the city charter, occurred the annual city election for the choice of city officers. The two elections were entirely independent of each other, but for some cause, presumably convenience and economy, the meetings were so warned and held that they were in progress at the same places and at the same time.

The effort to carry on in one place two meetings in which different persons were entitled to participate, encountered difficulties by reason of the provisions of the secret ballot law requiring ballots to be placed in envelopes and forbidding the giving of more than one envolope to each voter. In this dilemma the authorities, instead of avoiding the difficulty by providing separate machinery for each election, resorted to the expedient of providing two ballot boxes at each polling place. One was marked "Town and City Box." In this all entitled to vote for city officers were per-

mitted to cast their ballots. They were given one envelope, and in this were placed both the city and town tickets, which were thus voted in this box. The second box was marked "Town Box." In this those voters of the town who were not entitled to vote at the city election were permitted to cast their ballots. It thus happened that ballots for town officers were in each voting district deposited in two boxes. One box contained town ballots only; the other town ballots placed in envelopes with city ballots. Thus the two elections proceeded side by side until the polls closed. In each voting district counters for the town election were chosen and sworn. So also in each ward counters for the city election were chosen and sworn. They were entirely different persons. In each polling place two tables were provided. The "City and Town Box" was opened and its contents placed upon one table, around which sat the city counters. The "Town Box" was opened and its contents placed upon the other table, around which sat the town counters. The town counters opened the envelopes contained in the "Town Box," took out the ballots, and proceeded to count them. The city counters opened the envelopes contained in the "Town and City Box," removed the ballots therein contained, separated into different piles the ballots for city officers and those for town officers, and proceeded to count the former. The town ballots contained in this box, having been thus separated from the city ballots, were taken by the town counters, who, believing them to be lawful ballots entitled to be counted for all the town officers named thereon, added them to the ballots which had been cast in the "Town Box," and counted them together. The result of the election was declared as shown by this count.

At the town election the petitioner Grelle, and one Mc-Elligott, were the known candidates of one party for the office of selectman, Grelle's name standing first upon the ticket. The respondents, Pinney and Boughton, were the known candidates of another party for that office, Pinney's name standing first upon the ticket. The result of the elec-

tion, as declared as aforesaid, was that Pinney, Boughton and McElligott were elected, receiving respectively 2351, 2236, and 1988 votes, and that Pinney was elected first selectman. Grelle was declared to have received 1868 votes, and not to have been elected. In the present proceeding Grelle alleges that certain votes were improperly counted for each of the respondents, and asks that he be declared elected not only a selectman but first selectman of the town.

As against Pinney the petitioner's claim is, that he participated in the count of the town ballots in the third voting district. The action of Pinney upon which this claim is made is the following :—After the envelopes had been placed upon the tables, as before described, a machine designed to facilitate the process of opening the envelopes was produced. It was so constructed as to cut a narrow strip from one side of the envelope. The counters did not understand its operation. Pinney, who as first selectman for the year then ending had purchased it and understood its operation, chanced to be present. He was appealed to by the city counters to illustrate its operation. He complied, and by means of the machine cut off the side of some of the envelopes contained in the " Town and City Box." He did nothing more.

The judge to whom the petition was brought held that in so doing he did not participate in the count and declined to throw out any ballots cast for him. In this we think he committed no error. The thoughtless act of Pinney certainly comes close to the line of those proscribed. His example is one not to be commended, but we think that under all the circumstances a reasonable application of the statute, whose meaning we shall have occasion to more fully consider later, would not justify an infliction of the penalty which the law has provided for those who have the interest and opportunity to thwart the public will.

The most serious contention in the case relates to Boughton's right to the office to which he was declared chosen. He was selected and acted as one of the city election counters in the fourth ward. After the envelopes contained in

the "Town and City Box" had been deposited upon the table, he, at the suggestion of some one of the counters, counted the whole number of envelopes in the box, and selected therefrom for rejection such as were unsealed. Of envelopes so selected by him at least ten were rejected as unsealed. This done, he, together with his fellow city counters, proceeded to open the envelopes and count the city ballots in the manner before recited. The town counters likewise proceeded with their count as recited. Boughton never came in contact with the "Town Box" or with the ballots cast therein.

Upon this state of facts the question arises whether he took part in the count of the town vote? The judge holds that he did. This ruling was clearly correct. Boughton did not, it is true, participate in the particular and immediate manipulation of the ballots which was designed to arrive at numerical results, but he did participate in those manipulations of the ballots which were preliminary to the numerical calculations. He selected envelopes for rejection. He removed ballots from envelopes. He assorted ballots. These acts were necessary parts of the general work of the counters. They were as appropriate to the act of counting, and as essential to the process of arriving at a determination of the contents of the box, as the subsequent manipulations which were accompanied by the mental process of enumeration. What is perhaps still more significant is, that these acts afforded Boughton every opportunity to commit a fraud upon the ballots and thereby to influence the result which they recorded.

The object of the statute prescribing a penalty for a candidate taking part in the count is apparent. Its object is to prevent fraud by removing opportunity for its commission. If its language is to be construed as embracing only those acts of a counter which immediately attend the process of enumeration, its purpose must largely fail. The statute must be construed in the light of its manifest purpose and with regard to the remedy sought to be afforded by it. To the word "count" must therefore be given, not

its narrowest and most technical meaning, but that wider meaning, reasonably applied, which embraces all those acts of the counter which are within the natural and proper scope of his duties, and which bring to him any opportunity to perpetrate a fraud. Under this construction of the statute it is clear that Boughton took part in the count.

This reasoning and conclusion is, of course, based upon the assumption that the town ballots contained in the " Town and City Box " were legal ballots, so lawfully cast as to be entitled to be counted. Whether they were in fact such ballots is a question not before us. Counsel have not raised it. They have expressly waived all claim in that regard. The questions presented to us are raised upon the assumption that the election process employed was in conformity with law, and that the ballots as cast were legal ballots. For the purposes of our conclusions we have adopted that assumption.

What was the effect of Boughton's act? Our statutes provide that "no known candidate shall be moderator, or be put in charge of any box in which votes are cast for said office, or take part in the count thereof," and that "any violation of these provisions by any such candidate shall render the votes cast for him void." The petitioner contends that the effect of this provision is to invalidate all votes cast for a candidate guilty of any of the proscribed acts, no matter where the votes are cast. He claims that Boughton's participation in the fourth ward count made void all votes cast for him at the election; that it in effect rendered him a disqualified candidate. This, we think, cannot be the true interpretation of the statute. Such a construction is plainly not within the reason of the law. The language employed does not call for such a sweeping application. The evil sought to be guarded against, and the manifest intent of the law, point to its reasonable and true interpretation as being that the prohibited acts by any known candidate shall render void as for him all that general mass of ballots of which, by reason of his official relation to them, or of his actual contact with them or any

portion of them, he is afforded the opportunity to influence the result, or upon which he is thus given the chance to commit a fraud.

The application of this rule to all ordinary conditions is easy. Under such conditions the result would be that a known candidate who took part in the count in any voting district would render void all votes cast for him in that district, and none other. The conditions, however, existing in the election in question, were not the ordinary ones. The peculiar methods there employed present a question which can rarely arise, and which is not altogether free from difficulty. The respondents, upon the count of all the votes cast, were declared elected. The petitioner was declared defeated. He brings his petition to be declared elected. He asks the court to throw out certain votes. The burden is upon him to establish his claim to an election; to establish that sufficient votes were improperly counted for his opponent to overcome the latter's apparent and declared plurality. The judge below, upon ascertaining the facts before stated, and upon no further information save that the "Town and City Box" contained a larger number of town ballots than the "Town Box," threw out, as not entitled to be counted for Boughton, all the votes cast for him in the fourth voting district, thereby giving the petitioner a plurality over him of twenty-four votes.

Examining the conditions existing in the fourth voting district, we find that there were two boxes used to receive town votes. These boxes were not only separate boxes, but they were distinct and different in their character. They were used for independent purposes. They were not interchangeable. In no true sense can they be said to have been, in legal contemplation, the same box. The one marked " Town Box" was one whose character and contents as a part of the machinery of the town election was beyond the reach of legal criticism. When the polls closed the ballots cast therein were entitled to be counted. Boughton, as a city counter, never bore any official relation to them. He never, in fact, came in contact with the box or its contents.

In no way did he have any opportunity to commit a fraud upon the votes therein deposited. If the ballots there cast ever became void as to Boughton, it must have been either because his acts done upon the contents of the "Town and City Box" *ipso facto* and constructively carried their taint over into the contents of the "Town Box," or because they became invalidated by the fact that the town counters intermingled with them ballots which as for him ought not to have been counted.

In view of the anomalous circumstances under which the election was conducted, and of the essentially distinctive and independent character of the two boxes, we are of the opinion that it ought not to be held that Boughton's contact with the town ballots in the "Town and City Box," had in the performance of his official duty as a part of the machinery of the city election, communicated its taint to the contents of the "Town Box." Had the contents of the two boxes been kept wholly separate, and their results determined and preserved separately, or had the effect of Boughton's action been thought of at the time of the count and all votes for him in the "Town and City Box" been excluded from the count, it would be a harsh doctrine which would hold that he should not have the benefit of the ballots lawfully cast for him in the "Town Box" and absolutely preserved from all danger of fraud. If it be held that the result of his action did, by construction, reach over into the "Town Box," then there was no way in which, from the first moment of his active entrance upon his duties as city counter, the will of the people as therein recorded could have been preserved. We are of the opinion that the penalty of the statute ought not, in fairness and reason, to be carried so far.

The purpose of our election laws is to obtain a declaration of the will of the people. They can have no other legitimate aim. The object of the safeguards thrown about election machinery is simply to enable that declaration to be secured honestly and fairly and to be preserved inviolate. Any regulations or construction of regulations which lead

to any other result, are subversive of the fundamental principles of popular government. In giving the construction and application of election laws, these facts are to be borne in mind, and such reasonable construction given or application made as will most surely lead to the desired result. Fraud is to be guarded against, and opportunity for fraud prevented; but in seeking to prevent fraud that should not be unnecessarily or unreasonably done which can have no other effect than to defeat the very object which the use of the ballot is intended to secure. It is necessary and proper that fraud and opportunity for fraud should have their penalty in the annulment of ballots lawfully cast. That penalty, however, should not be extended, either in construction or application, beyond the requirements of a reasonable necessity.

That the inadvertent intermingling by the counters of void ballots with the good ballots in the "Town Box" did not serve to invalidate the latter is clear. A counter who through ignorance takes from unsealed envelopes the void ballots therein and adds them to the mass of good ballots, or who in any other way mistakingly mingles ballots which have not been lawfully cast or not cast at all with those which have been, does not thereby render void the whole. The law does not visit such a penalty upon candidates or voters. We are of the opinion, therefore, that the petitioner failed to make out his case, and that the judge below erred in throwing out all the ballots cast for Boughton in the fourth voting district, upon no other information than that hereinbefore recited.

The judge below, having found and declared the petitioner elected, issued a certificate of election to him. Boughton forthwith took an appeal to this court. The petitioner thereupon made demand upon him for the appurtenances of the office, which was refused. The petitioner then asked the judge for a peremptory writ of mandamus, which, against Boughton's objection, was issued. The same was not issued for the reason that the judge was of the opinion that the appeal was taken for delay, or that the due administration

of justice required it. In this there was error. Section 58 of the General Statutes provides that the decision of the judge upon a petition of this character shall be conclusive, and if in favor of the petitioner, that a certificate to that effect, under the seal of the court, shall entitle the petitioner to hold and exercise the duties and powers of the office. It is added, that this provision shall not affect the right of appeal to this court. Section 59 prescribes the mode of procedure upon appeal, and that final judgment shall be rendered in the case by the judge originally hearing it, or, in case of his death, absence or inability to act, by some other judge of the Superior Court, as this court shall advise. The right of appeal thus preserved is given by section 1137, wherein it is provided that it shall lie from the decisions and rulings of any judge in any matter or proceeding before him, in the manner before provided for an appeal from the judgments of courts. Prior sections give the right of appeal after final judgment rendered by courts in civil actions, to either party thinking himself aggrieved by the decisions of the court upon any question of law arising upon the trial. Section 1134 provides that after such appeal execution shall be stayed until the final determination of the cause.

It will be observed that neither section 58 nor section 1137 expressly says that the exercise of the right of appeal which is therein given shall operate as a stay of execution. The right of appeal is given in the manner before provided, but the provisions of section 1137, subsequent to the granting of the right of appeal, make it clear that it was intended to give the right with all its incidents, and that it should operate as a stay of execution. This construction is emphasized by the general principle that execution should not issue until after final judgment, and by the provision in section 59 for final judgment upon the advice of this court. We are clear that appeals taken from the judgment of a judge under section 1137, of which the present is by reservation of section 58 one, are subject to the same provisions

as to stay of execution as those taken from the judgment of a court.

The writ of mandamus issued in this proceeding was the writ of execution simply. After appeal it should not have issued except for reasons not existing or found in this case.

There was error upon the respondent Boughton's appeal, and no error upon the petitioner's appeal.

In this opinion the other judges concurred.